Are you gonna go first, I think? And then you saw before, let us know how much time you want to reserve for rebuttal, and we'll all endeavor, probably unsuccessfully, to stick with that. Yes, Your Honor. Sam Arab for Mr. Kurns. I'd like to reserve three minutes for rebuttal. There are two cases that the Court should consider here to inform the rule of decision. Those are United States v. Lucas and United States v. Mesas de la Juz. Sorry, what was the second? Mesas de la Juz. Excuse me, Jesus. In the Jesus, this circuit remanded a case after the District Court made two comments on the record regarding a defendant's silence. The facts in that case were that defendant was charged with kidnapping. That information ended up in the pre-sentence report, but the witnesses to substantiate that charge didn't show up for the evidentiary hearing. As a consequence of that, it was still in the PSR, but they didn't testify, the alleged victims. Now, at the sentencing hearing, the judge said the following. You tell me about the unavailable witnesses' story, that this is not a true story, but I don't have evidence as to any other truer fact. And the second comment the judge made in that case, asking the defense counsel, wouldn't a statement under oath from your client that it didn't happen be required to substantiate an evidentiary hearing? Now, if you compare that to what the District Court did in this case, first of all, after having a colloquy with defense counsel for a little while at the beginning of the hearing, before he heard any evidence, the court denied all defense objections without even hearing a single piece of evidence. And that's in the X of the record, page 20 to 21. When defense counsel, me, objected to that, called that illegal and burden-shifting, he permitted some testimony and interrupted the cross-examination to say, if you want to add to your evidence, you can put Mr. Kearns on the stand under oath and have him deny that he handled those weapons. Now, you compare that with the pursuit. Let me, excuse me, so about one, two, three, four, four back in that. And the government, I think, messed up here because in their brief, in the government's brief, in their providing this colloquy, they left out something that I think is actually very helpful to the government, which is the court said, before it said what you just said, the court said, I guess if you want to add to your evidence, you can put Mr. Kearns on the stand under oath and have him deny that he handled those weapons, if that's the evidence. That's pretty important. It says it's not actually in the government's brief. I'm not sure why they get, the government screwed that up, I think. And they just kind of, they must have, when they were transcribing into the brief, they, and you're probably aware of this because you know what happened here, and you didn't tell the government, which is, I suppose, understandable. But that's pretty important because the court's actually saying, if you want to add to your evidence. So it's not consistent with the way you were just characterizing it, that the court believed that there was no evidence and that basically your client lost because the only evidence, you know, the only way that your client could provide any evidence. Instead, he says, if you want to add to your evidence. And so that's different because he's already saying there's evidence there, but if you want more, if you want more. And that, I think, makes it sort of different than the Mesas de Azuz case. I disagree because immediately thereafter, the court, the judge says, a couple of sentences down, after I explained it is the government's burden, and he said, I understand. And he says, Mr. Kerr, the judge then explicitly said that to meet, if you want to meet the preponderance, you can put Mr. Kerr on the stand and have him deny that he touched those weapons under oath. And that's actually the record. No, I get that. And if you read that in isolation, which is unfortunately the way it was presented in the government's brief because the government forgot, then it does sound like maybe saying, listen, if you want to meet the preponderance. But if you read that in conjunction with the statement that was like literally the court's statement, two statements earlier where he says, if you want to add to your evidence, I think we have to read those things together, correct? Well, yes. But then I would submit to you, Judge Van Dyck, that let's read it together, what he said at the very beginning before he heard any testimony. I'm going to deny all your objections before he hears any testimony. And then at the very end, the fourth time he comments on my client's silence is, we do not have any statements from any witnesses who didn't testify. And I compare that to what the court said in the Jesus. I don't have any other evidence as to a truer story. This is a more direct evidence, direct. Now, the only witness who wasn't there, who didn't testify, was my client. We did posit some evidence. That evidence came from my investigator, David Jeseritz. But the statement in Mesa de Jesus is stronger than that because there the court's saying, wouldn't I have to see something from your client? For instance, a statement under oath, that's not what we have here. I mean, I just, we don't have something that strong. I disagree. When the court explicitly says in the beginning, I'm going to deny all your objections, I haven't heard a single piece of evidence, then it follows up by interrupting our cross-examination by saying, you know, we're going to get the same answer to all these questions as I'm asking about the ATF forms. You know, if you want to actually meet the preponderance, Mr. Arup, why don't you put him on the stand to have him deny that he had them? And I think that is a burden shifting. Instead of making the government prove both the quality and the quantum of the evidence of their case. Well, I don't think so because then you say it's the government's burden of proof and the court, of course, says, I know what the burden of proof is. It's not saying, no, it's your burden of proof. It's saying, I know whose burden of proof it is. Yes, yes. But in Mesa de Jesus, the circuit concluded that based on these statements, it is likely on a de novo review, which is what it would be in this case for the Fifth Amendment violation that we're proffering, that he drew a negative inference from my client's silence. And that's what we're suggesting that he did. Because four different times he commented, well, three different times he commented on my client's silence. He commented on the fact that he didn't testify. Now, compare that to the case in the United States of E. Mitchell, a 1998 case from the United States Supreme Court, where the defendant in that case was one person of multiple co-conspirators in a scheme of selling cocaine, if I recall that correctly. She didn't take a deal. She didn't cooperate with the government. And her co-conspirators testified as to her activities. Now, as a consequence of that, the court in that case suggested, if you don't testify, if you don't testify at the sentencing hearing, then we're going to hold that against you. And there was a circuit split on that issue. The Supreme Court said very unequivocally that not only does the right to remain silent, and that's what that case stands for, extend all the way through sentencing, because in many circumstances, having your client testify at sentencing, they'll become, quote, unquote, I don't remember the exact score, the unwitting instrument of their own condemnation. Now, of course it is the government's burden of proof. And that's what I kept referring back to. And that's the other case that I want the court to focus on today. It's the United States v. Lucas. It was taken en banc, and a decision was rendered in May. In that case, the defendant, I see I'm a little bit over my time here, but I'll just finish this point really quickly. The defendant, what the evidence in that case was a screenshot from his phone, that he was holding something that looked like a pistol or a firearm. That was the evidence, that if Lucas pleaded guilty to possession of a firearm under the 922G1 statute, and that was the evidence. He pleaded guilty to holding that firearm in that photo. Now, the question at sentencing, which before it was taken en banc, the circuit called insufficient, was whether the magazine attached to that firearm was a high-capacity magazine. Now, the evidence they had in this case was a jail phone call where there was second-hand information about him actually possessing that kind of high-capacity magazine. They had photos and the fact that the defendant pleaded guilty to holding that firearm. Now, in this case, the high-capacity firearm, there is no such evidence. The evidence in this case for that high-capacity firearm. Which firearm are you talking about? I'm talking about the absent witness or the one that the agent testified about? The absent witness. So while I'm not sure. The judge said he didn't rely on that, right? No, Your Honor. He relied. So the fact that he imposed the high-capacity magazine enhancement means he relied on something. He relied on a photo of what they call an AR-style pistol. That photo. And the agent's testimony about it, correct? Yes. Yeah. Okay. So we're not talking about an absent witness here. No. We're talking about an agent experienced with firearms describing the evidence that he sees in the photograph. And you're saying that's insufficient. I am saying that. It was insufficient in Lucas. Before the panel. Excuse me? Before the panel in Lucas. No. It was insufficient. Lucas was taken en banc to address the question whether we should change it from clear and convincing to preponderance of the evidence standard in this circuit. It wasn't. And then it was remanded, both in the original case and in the subsequent en banc case, to determine whether this is sufficient evidence. And they commented specifically on application no. 2 and those. But more importantly, it's a grainy photo. And when I asked... I want to make sure. We're about ready out of time. Yes. So I'll give you a minute here. All right. But go ahead and... Unless either of my colleagues has questions for now. No, thank you. Okay. I just want to make sure we have time. The last thing I'll say, I asked Special Agent Inc., do you know if this is a firearm? Do you know what the model is? Do you know what the make is? Do you have the serial number? I don't know. I don't know. I don't know. I can't tell from the photo. Do you know if it's chambered in 22? I can't tell from the photo. Good morning, Your Honors. May it please the Court. Kelsey Sable from the District of Montana on behalf of the United States. The District Court correctly calculated the guideline range that applies to Mr. Kearns in this case. With respect to the base offense level, the District Court based that on the photograph of Mr. Kearns holding the AR-style firearm in Agent Inc.'s testimony. And Agent Inc. testified that that photo depicted an AR-style firearm with a general 30-round AR-style magazine. And he was able to tell that because of the magazine's size relative to its grip. So most AR-style, you know, 22-round firearms use a magazine that looks like a regular AR magazine. I was trying to look at that picture. But do I remember correctly that there was no, you know, the FFL sales records, there was no record of having sold a 22 rimfire caliber AR-style pistol, is that correct, in those records? I thought I remember reading that somewhere. That's correct, Your Honor. And then there was none when they actually looked at the inventory in the store. There was none in the inventory in the store. Is that correct too? That is correct, Your Honor. So when you put those two things together, that seems like, was there a record of selling an AR-style pistol that was chambered in, I assume, .223 or .556, you know, not rimfire? Not that's in the record, Your Honor. Not that was established by the record that was recovered. Was there one in inventory? No, not that's in the record, Your Honor. Not that we're aware of. I guess I suppose that somebody, I guess the FFL records could have been incomplete, I suppose, you know, or I suppose somebody could have been bringing it in to possibly pawn the gun and then he handled it and then left with it? What is the thinking as to why there's no record of one type or the other, either in inventory, you know, when they went and looked and saw what physically was in the inventory, or in the sales records? Well, so I think, Your Honor, it's difficult to tell exactly what, so we don't know from the record what exact firearm that is depicted in the photo. You know, the agent was able to testify it's AR style. The agent testified there were AR style firearms recovered from the search of the pawn shop, but we don't know the make, model, or caliber of that serial number. And the agent was able to testify that there were no .22 caliber AR style firearms recovered during the execution of the search warrant. You know, but that's, you know, that was not, that's not the question under Application Note 2 with respect to the enhanced base defense level. You know, the question under Application Note 2 is whether the firearm has an attached tubular device that takes .22 caliber rimfire. And as the agent testified, you know, this firearm that we're looking at in the photo has a general 30-round magazine. It's clear from the photo this is a box-style magazine. So that's why even... So is that, maybe I misunderstood something. So if it takes .22 rimfire but it's a box-style magazine, then it still qualifies as a higher capacity firearm for purposes of the enhancement? No, I apologize, Your Honor. I don't, and this isn't really clear in the record, but it's our understanding that those two things, a tubular device that takes .22 caliber rimfire and a box-style magazine, are mutually exclusive. You don't have... They are. No, I understand that, but, like, I don't, but I understood his argument to be that this could have been a .22 rimfire firearm that used a box-style magazine, right? And they make those things. And the box-style magazines for .22 rimfire look, you know, if I'm from me to the back of the room, they look like a regular AR magazine. They're not skinnier. Like, they look like a full-size AR magazine. So I think that's what his argument here is, is it could have been that. And so it's somewhat persuasive evidence that there is no record of having sold one of those, nor was there one in inventory, as I understood the record showed you. That's correct, Your Honor. And I thought, and I was asking you, is there any record of having sold an AR-style non .22 rimfire firearm in the sales records? And you're saying there is no record of that? There's no record. There's nothing in the record of one of those firearms being sold. It is in the record that there were no .22... No, just to be clear, I mean a regular AR, just not rimfire. There's nothing in the record about one of those being sold by this pawn shop? I don't believe so, Your Honor, no. But there is evidence in the record that there were AR-style firearms that were not chambered in any type of .22 caliber ammunition that were recovered from the pawn shop during the search warrant. And we submit that that is sufficient under the preponderance standard. Are any of those pistol-style? Do you know? That's not in the record, Your Honor. No, I don't know. But again, we submit that's sufficient under the preponderance standard to apply the base defense level based on this firearm. And with respect to the second guideline enhancement, the four-level enhancement for the number of firearms, we think it is clear from the record when you look at the context of the district court's comments that it was not burden-shifting and that it was not placing the burden on Mr. Kearns to prove that he did not handle these firearms. What the district court was doing was, you know, at the time the district court made these comments, Agent Ink was testifying that he could not determine whether Mr. Kearns physically put his hands on each of these firearms. And the district court, you know, was saying that he's not going to be able to give us this evidence, and so here's one way that we could take this evidence with respect to whether Mr. Kearns, you know, touched the firearms. And the district court made very clear in its eventual ruling on this enhancement at excerpts of the Record 76 that the government, it said the government has met its burden by a preponderance of the evidence on this enhancement and clearly understood that it had the burden. Where did it say that again? At 76? Excerpts of the Record 76, Your Honor. The district court said the government has met its burden by a preponderance. It identified specifically the firearms that it relied on to find that the government met its burden to prove that the defendant was in possession of all of these firearms. And it went through all of the evidence that the government presented, including Agent Ink's testimony and distinguished the cases cited by Mr. Kearns. And I would also point out, Your Honor, that there was sufficient evidence in front of the district court of the firearms that Mr. Kearns did touch and did, there's direct evidence that he directly possessed at least eight firearms, even without relying on the firearms that he was listed as the transfer on the form of 4473. I didn't know we got to eight by that direct evidence. There was definitely pictures of him touching firearms. But was there pictures? Two that he sold, right? Two that the defendant sold to the pawn shop himself, right? So, Your Honor, there were four that he sold to the pawn shop. Two of those four were captured on surveillance video stills. And so that's part of your evidence, because you're counting the other two that aren't even on the video because in theory he had to carry them out or something in order to sell it to the pawn shop. So we do, but I don't think we need to, Your Honor. And the way I get there is, so there are five firearms, and they're listed in the reply brief on page 14, and that everybody agrees are supported by the surveillance still video of Kearns handling them. Those include two of the four that he sold to Modern Pawn as a customer. There are, in addition to that, three more captured on video, the AR-style firearm that we've been discussing. And then there are two photographs of Mr. Kearns handing long guns to customers. And none of those three we were able to identify by specific make, model, or serial number. But those two long guns are at excerpts of the record 176 and 167. And so we, and as Agent 8 testified, there were no fake firearms or replica firearms recovered during the search. You know, nobody denies Modern Pawn. But you don't know precisely what firearm that was, but you know he had a firearm in a video. In his hand, yes, Your Honor. And then there were. Go ahead. I'm sorry, I was going to say then there were the second two of the four that he sold to Modern Pawn as a customer that were supported by the bill sale from Modern Pawn for one of them an ATF Form 4473, and then a Leeds online ticket that Agent 8 testified to. So that's just, I'm sorry, I'm counting here. That's the five that are on video that we know what he, what those firearms are. Then two more that he sold, so we don't have a video, we assume. And then two more videos that we don't know what the firearm is, but we know he was holding a firearm. I believe three more, Your Honor, the two long guns and the AR style. Okay. Yes. And so that is, that alone is sufficient to get us to the eight firearms necessary for that enhancement. And so, Your Honors, I see I'm almost out of time, so if there are no further questions, we would just request that the Court affirm. Any other questions from my colleagues? All right, thank you. Thank you. We'll hear from opposing counsel. Thank you. My argument on appeal isn't that that's a .22 caliber. My argument on appeal is that we don't know what that is. There wouldn't be any record of sold firearms if, in fact, it is a BB gun, if, in fact, it's some form of replica, if it's a firearm at all. My contention is that if you're going to seek a high-capacity enhancement, you've got to prove two things, number one, that it's a firearm, and number two, that it's a high-capacity magazine. In Lucas, they remanded on evidence that was twice as strong. They knew it was a firearm. The magazine protruded from the handle of the pistol. They couldn't testify with experts whether there was a blocker in that magazine. Now, that was sufficient in Lucas to remand for resensing under the preponderance standard. It should be here, too, because we don't have any evidence in the record what kind of firearm this is. And as you pointed out, Judge Van Dyke, from here to there, it may look like one. There are BB guns that are designed to look like real firearms, look like AR-style pistols. They sell for hundreds of dollars. And in a pawn shop like this one, where the firearms, and if you look at one of the photos, I think it's XF-143, they're on the wall behind the counter. The rest of the store is for consuming goods, jewelry and other things. There wouldn't necessarily be a record, and considering the way this specific pawn shop was. I understand that there is at least a speculative possibility that this was an error. But given the agent's overall investigation, the absence of any findings of imitation or replica firearms, what's unreasonable about the district judge inferring from circumstantial evidence and the direct testimony, you know, this was probably a real firearm of a style that qualifies for the enhancement. Well, with respect, I think that turns the constitutional provisions that require them prove the case on its head. I think it's the government's. No, it simply says, I have incomplete evidence here, but all the evidence in front of me suggests that this enhancement should apply. Well, it doesn't. When I asked, all the evidence doesn't suggest that. The evidence actually suggests that he doesn't know what it is. And he never went there and actually recovered those firearms. And the absence of information shouldn't go against my client. And the fact that there is no other evidence that it couldn't possibly apply shouldn't go against my client. The government has the duty to demonstrate that that, in fact, applies. It sounds like, though, you're arguing for not just clear and convincing evidence, but proof beyond a reasonable doubt. No, Your Honor. I am not. I mean, again, I refer this, or I less analogize this to Lucas. In Lucas, they knew it was a firearm. There was no need for circumstantial evidence. They knew that a magazine protruded out of it. But they didn't, the only thing they didn't know is, is there a blocker in there? And they had expert testimony of this issue. And it was still remanded for sentencing under the preponderance standard. Now, taking this in isolation, that specific object, it's a grainy photo, a still photo from a surveillance. And that's the only evidence it has. And the evidence they have is, I'm looking at this, and this is what it looks like. Thank you. So I think, you know, we've taken you way over, and we appreciate your argument. Let me make sure my colleagues don't have any further questions. I don't think we've seen none. Thank you both for your argument. Thank you. And we'll submit this case as of date. All right, we're going to go to the next case.
judges: Hamilton, VANDYKE, THOMAS